FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ AUG 19 2026 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **TIME DARDEN,**<br>CV 26- 5017<br>*Plaintiff,*<br>v.<br>**LIBERTY MUTUAL TECHNOLOGY GROUP INC. and LIBERTY MUTUAL GROUP INC.,**<br>*Defendants.* | Case No. ______ MERLE, J.<br>ESHKENAZI, M.J.<br>**COMPLAINT AND JURY DEMAND**<br>Employment Discrimination, Retaliation, Failure to Accommodate, and Related Claims |

RECEIVED
AUG 19 2026
PRO SE OFFICE

**JURY TRIAL DEMANDED**

**PRELIMINARY STATEMENT**

1. Plaintiff Time Darden brings this action against her direct employer, Liberty Mutual Technology Group Inc., and the affiliated entity named in her EEOC charge, Liberty Mutual Group Inc. (collectively, "Liberty" or "Defendants"), for discrimination, retaliation, failure to accommodate, and related violations of federal, New York State, and New York City law.

2. Plaintiff is a Black woman who has disabilities. While employed in Liberty's technology organization, she was denied mentorship, production work, pairing opportunities, schedule flexibility, visibility, and advancement support afforded to younger, white or perceived-white, male, and/or non-disabled colleagues.

3. After Plaintiff complained internally about the underlying unequal treatment and later specifically complained about FMLA interference and requested disability accommodations, Defendants escalated negative performance narratives, denied her bonus and overtime opportunities, subjected her to performance-improvement plans and heightened scrutiny, and continued to withhold meaningful work, training, and support.

4. Moynihan and other Liberty personnel delayed or only partially decided Plaintiff's disability-accommodation requests; Moynihan did not issue a determination on an additional medically supported accommodation request; and, while Plaintiff was on approved leave, Moynihan later stated that Plaintiff's position was unavailable and imposed a return-to-work and redeployment process that Plaintiff could not access without internal systems or job information. As detailed below, Liberty's failure to

REC'D IN PRO SE OFFICE
AUG 19 '26 AM10:57

identify an actual position and provide its current essential functions and job demands prevented Plaintiff and her providers from making the job-specific assessment Liberty demanded.

**PARTIES**

5. Plaintiff Time Darden is a resident of Kings County, New York, and a participant in the New York Address Confidentiality Program. During the relevant period, she worked remotely from Brooklyn, New York, as a Technology Associate and later as an Associate Software Engineer. Plaintiff appears pro se.

6. Defendant Liberty Mutual Technology Group Inc. ("LMTG") is a corporation doing business in New York and is identified on Plaintiff's earnings statement as her employing entity. Its business address is 175 Berkeley Street, Boston, Massachusetts 02116.

7. Defendant Liberty Mutual Group Inc. ("LMGI") is an affiliated Liberty Mutual corporation doing business in New York. Plaintiff named LMGI as the respondent in EEOC Charge No. 520-2026-01763. Its business address is also 175 Berkeley Street, Boston, Massachusetts 02116.

8. Upon information and belief, LMTG and LMGI shared or centralized material employment functions relevant to this action, including human-resources administration, leave and accommodation administration, redeployment, payroll, employment policies, employee records, and decision-making. Their personnel communicated with Plaintiff as representatives of "Liberty Mutual" without consistently distinguishing the corporate entity for which they acted.

9. Upon information and belief, Defendants exercised common or interrelated control over the terms and conditions of Plaintiff's employment and operated as a single or integrated employer, joint employers, and/or agents of one another for the employment practices at issue. At minimum, the two entities share an identity of interest concerning the EEOC charge: they use the same principal address, had notice of the charge, and had aligned interests and a common opportunity to participate in the administrative process.

10. At relevant times, Dante Martinez and Daniel Bolen were Plaintiff's managers; Jonathan Daniels and a supervisor referred to herein by her first name, Jamie, whose surname Plaintiff does not presently recall, were within Bolen's management chain and were notified of Plaintiff's complaints regarding Bolen's conduct; Rachael Moynihan was the Talent Services representative assigned to Plaintiff's accommodation matter and later communicated Liberty's leave, return-to-work, and redeployment positions; Kristen Taylor was Moynihan's colleague and transmitted the August 28, 2024 partial accommodation determination; Joseph Piccolo was a Talent Consultation representative who received Plaintiff's complaints regarding Bolen; and Frances Gomes transmitted Liberty's June 3, 2025 six-month leave letter. These individuals acted within the scope of

their work for one or both corporate Defendants. Plaintiff names the responsible actors for factual clarity but does not name them as individual defendants.

**JURISDICTION AND VENUE**

11. This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.; the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq.; the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 et seq.; 42 U.S.C. § 1981; and the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et seq.

12. This Court has supplemental jurisdiction over Plaintiff's New York State and New York City claims under 28 U.S.C. § 1367 because those claims arise from the same case or controversy as the federal claims.

13. Venue is proper in this District under 28 U.S.C. § 1391 and 42 U.S.C. § 2000e-5(f)(3) because Plaintiff worked in Brooklyn, a substantial part of the events and omissions occurred in or had their employment impact in Brooklyn, and the relevant employment records would have been maintained for Plaintiff's Brooklyn-based employment.

14. The New York City Human Rights Law applies because Plaintiff worked in New York City and experienced the impact of Defendants' challenged employment practices in New York City.

**RELATED ACTION**

15. Plaintiff has a pending benefits action in this Court, Darden v. Liberty Mutual Health and Welfare Plan et al., No. 26-cv-00340-NCM-LKE. That action concerns the denial and administration of disability benefits under ERISA. This action concerns employment discrimination, retaliation, accommodation, leave, and redeployment. The actions are legally distinct, although certain leave-related communications, entities, and background events overlap. Plaintiff will identify the ERISA action on the Civil Cover Sheet as arguably related.

**ADMINISTRATIVE EXHAUSTION AND TIMELINESS**

16. Plaintiff filed a verified charge of discrimination with the United States Equal Employment Opportunity Commission on May 19, 2026, Charge No. 520-2026-01763. The charge named Liberty Mutual Group Inc. and expressly alleged race, color, sex, age, and disability discrimination; retaliation; hostile work environment; failure to accommodate; failure to engage in the interactive process; and continuing action.

17. The EEOC issued a Dismissal and Notice of Right to Sue on May 22, 2026, which Plaintiff received by email that same day. A copy is attached as Exhibit A.

18. This action is filed within ninety days of Plaintiff's receipt of the Notice of Right to Sue. More than sixty days have elapsed since Plaintiff filed her age-discrimination charge.

19. The charge was not dual-filed with the New York State Division of Human Rights or the New York City Commission on Human Rights. Plaintiff has not elected an administrative remedy that bars her New York State or New York City claims.

20. LMTG was Plaintiff's direct employer, is affiliated with the respondent named in the charge, shared the same principal address, and had an identity of interest with LMGI. Claims against LMTG therefore fall within the charge's scope and the purposes of the administrative-exhaustion requirement were satisfied.

21. Defendants' post-charge conduct, including their continuing refusal to engage in an accommodation and reassignment process except on the conditions described below, is a continuation of the conduct expressly alleged in the charge and is reasonably related to the charge.

## FACTUAL ALLEGATIONS

### A. Plaintiff's qualifications and protected status

22. Plaintiff earned a bachelor's degree from Cornell University and successfully completed Liberty's technology-training program. She was employed first as a Technology Associate and then, after a promotion in early 2023, as an Associate Software Engineer.

23. Plaintiff is Black, is a woman, and was over the age of forty during the material period. To Plaintiff's knowledge, she was the oldest employee engineer and the only Black employee engineer on her assigned team.

24. Plaintiff has actual disabilities and a record of disabilities within the meaning of applicable law. Her impairments, separately and together when active, substantially limit major life activities and major bodily functions, including concentrating, communicating, thinking, sleeping, walking, standing, performing manual tasks, and other physical and neurological functions.

25. Defendants knew of Plaintiff's disabilities and disability-related limitations through her accommodation requests, supporting medical documentation, leave requests, and related communications.

26. While actively working in 2024, Plaintiff was qualified for and could perform the essential functions of her Associate Software Engineer position with reasonable accommodation. Plaintiff had disabilities before the challenged events but was working and functioning in her position; during the course of the challenged conduct, her physical and psychological functioning materially deteriorated. After Plaintiff began leave, she remained entitled to an individualized assessment of reasonable accommodation, leave,

return to work, and reassignment based on an identified position and its essential functions.

**B. Unequal mentorship, assignments, and advancement support**

27. In or around 2022, Plaintiff joined an engineering team whose other employee engineers were white or perceived as white and generally in their twenties and thirties. There were no other women employee engineers when Plaintiff started, except one woman who left shortly afterward.

28. Mentorship, pairing, production assignments, and visible technical sponsorship were important mechanisms for obtaining work, learning the codebase, developing skills, being evaluated fairly, and advancing within Liberty's engineering organization.

29. Plaintiff repeatedly requested mentorship from a person who worked in her codebase and knew the programming language in which she was assigned to work. Defendants did not provide comparable mentorship, support, or technical sponsorship to Plaintiff.

30. When Plaintiff was promoted to Associate Software Engineer in early 2023, her manager, Dante Martinez, told her, "this will be the easiest promotion you will get." Plaintiff thereafter sought the development needed to advance to Software Engineer, the next level in her own progression, but Defendants withheld development and advancement support provided to younger, white or perceived-white, and/or male colleagues.

31. A white woman in Plaintiff's training cohort, identified here as Hanna, joined a sister team at approximately the same time and advanced from Technology Associate to Associate Software Engineer and then to Software Engineer. She received visible mentorship and technical sponsorship from a senior technical employee. Plaintiff did not receive comparable support.

32. A white male colleague in his thirties, Cameron Andrukaitis, had longer tenure than Plaintiff and was promoted to Senior Software Engineer. Plaintiff was not seeking the same promotion; her next level was Software Engineer. Mentoring another employee was a written criterion for Andrukaitis's promotion.

33. Defendants represented or credited Andrukaitis as having mentored Plaintiff. That representation was false: Andrukaitis did not mentor Plaintiff and stated that he had mentored no one. After his promotion, Defendants assigned him actual mentees, providing him the type of career-building opportunity that Plaintiff had repeatedly requested but did not receive.

34. Although Andrukaitis was not Plaintiff's formal manager, he directed her to non-production or low-visibility assignments that were not intended to be pushed into the codebase or used as production work. This constrained Plaintiff's ability to create a contribution record, gain production experience, demonstrate productivity, and develop

toward promotion. Andrukaitis also engaged in repeated antagonistic conduct toward Plaintiff, including failing to provide expected pairing or work support and failing or refusing to answer work-related questions in a manner that was hostile rather than merely unhelpful. Plaintiff reported Andrukaitis's conduct to Talent Consultation and advised Liberty that the conduct was interfering with her ability to work; the conduct nevertheless continued after Plaintiff's complaints.

35. In summer 2024, Defendants added two younger Hispanic women engineers to Plaintiff's team and provided them with mentorship and support that Plaintiff had repeatedly requested but did not receive.

36. Defendants also denied Plaintiff schedule flexibility afforded to younger, white or perceived-white, male, and/or non-disabled colleagues. Plaintiff was told that she was not permitted to flex her schedule, but HR later confirmed that the stated restriction was not the applicable rule.

37. Plaintiff's manager required her to obtain specific permission to perform evening deployment work that was already assigned to her as part of the team's ordinary rotation, then failed or refused to approve the overtime needed for that assigned work. Other colleagues were not subjected to comparable approval barriers.

38. Managers and certain colleagues repeatedly failed or refused to answer Plaintiff's work-related questions while providing younger, white or perceived-white, male, and/or non-disabled colleagues more responsive support. In the months preceding her July 2024 complaint, Bolen withheld peer-recognition awards known as "Shine Points" that Plaintiff had earned, suppressing her visibility. Plaintiff raised Bolen's withholding of her Shine Points in her July 29, 2024 complaint to HR, after which Talent Services personnel directed Bolen to release the Shine Points to Plaintiff. Plaintiff does not yet know the full extent to which Bolen withheld other recognition, opportunities, or benefits from her during this period, and reserves the right to supplement these allegations following discovery.

**C. Performance narratives, leave complaints, and retaliation**

39. Plaintiff complained to Martinez about inadequate mentorship, support, and guidance compared with the support available to colleagues and asked that the unequal conditions be corrected.

40. After Plaintiff raised those concerns, Martinez made false or misleading statements about her performance, damaged her third-quarter and annual evaluations, and, in or around October 2023, removed her from the pairing pool.

41. The pairing pool was a primary mechanism through which engineers obtained work assignments, training, assistance, collaboration, visibility, and professional development.

Although Plaintiff's exclusion was represented as temporary, Defendants did not restore her to the pairing pool; the exclusion continued from in or around October 2023 until Plaintiff went on leave on December 3, 2024.

42. As a purported alternative to pairing, management said Plaintiff would receive independent, low-complexity stories. Defendants did not provide enough suitable stories, withheld or restricted access to available work, and did not provide the training needed for unfamiliar assignments. Defendants then treated the predictable production and development deficits as evidence of poor performance.

43. Defendants used the tainted 2023 performance narrative to deny Plaintiff one hundred percent of her 2023 bonus.

44. On January 2, 2024, after Martinez had ceased being Plaintiff's manager, Martinez emailed Plaintiff and copied her new manager, Daniel Bolen, emphasizing that Plaintiff had completed only one story during the prior period and expressing an expectation that she complete more. Martinez sent the email while Plaintiff was out on sick leave, after having been notified of her absence. Martinez himself had previously removed Plaintiff from the pairing pool, restricted her to selected low-complexity work, and designated Andrukaitis to create or identify that work; Plaintiff repeatedly had periods in which the promised work was unavailable to her. Plaintiff later reported this sequence to Talent Consultation. Upon information and belief, Martinez transmitted additional negative or misleading information to Bolen during the management transition.

45. Bolen initially indicated that he would restore Plaintiff to pairing, but he did not do so. He later attributed the continuing exclusion to Martinez and stated, in substance, that he was continuing Martinez's decision. Bolen nevertheless chose to continue the exclusion throughout the remainder of Plaintiff's active work.

46. Bolen thereafter repeated or intensified threats, false accusations, heightened scrutiny, restrictions on routine work, denial of overtime approval, lack of mentorship, and unequal treatment. Bolen also raised his voice at Plaintiff and communicated with her in ways that aggravated known disability-related communication limitations.

47. On or about April 4, 2024, Plaintiff sought answers from management and HR about false or misleading information, threats, unequal treatment, lack of mentorship and work support, and interference with protected leave. HR instructed her to make a formal complaint, which Plaintiff submitted in writing, with supporting documentation, on or about April 10, 2024. The complaint documented the underlying conduct and specifically raised FMLA interference and retaliation. Throughout spring and summer 2024, Plaintiff repeatedly complained to Talent Services personnel, including Preeti Gupta and Joseph Piccolo, about ongoing FMLA interference, and Defendants did not stop the conduct. Plaintiff also requested in writing that Talent Services clarify the leave policy applicable

to her; Piccolo and other Talent Services personnel did not provide that written clarification. Plaintiff further notified Bolen's supervisors, including Jonathan Daniels and a supervisor referred to herein by her first name, Jamie, whose surname Plaintiff does not presently recall, of Bolen's conduct, and both declined to intervene. During one such conversation, Piccolo responded dismissively to Plaintiff's report, laughing and stating in substance that he did not think Bolen would do that. Plaintiff later requested disability accommodations and complained about failures in that process.

48. In November 2023, Plaintiff told Martinez that she intended to apply for intermittent FMLA leave. Martinez questioned why she would apply for FMLA rather than use vacation, snickered, said that he did not know about FMLA, and told Plaintiff to educate him. Plaintiff initially used one week of vacation.

49. Plaintiff's intermittent FMLA leave was approved effective November 20, 2023. No later than March 21, 2024, Bolen received written notice that Plaintiff's intermittent leave was approved for one episode per week lasting up to one day. Plaintiff complained to HR about FMLA interference and retaliation before the first PIP was issued.

50. HR failed to maintain the confidentiality it had represented would apply to Plaintiff's complaint. On or about May 15, 2024, HR closed its review without correcting the underlying conditions. On May 29, 2024, Defendants placed Plaintiff on a Performance Improvement Plan.

51. The May 29 PIP was predicated in material part on production deficits arising from conditions Defendants controlled, including insufficient story access, pairing-pool exclusion, and assignments for which Plaintiff had not received adequate training. It also required eight hours of pairing per week, confirming pairing's importance, while Defendants still did not restore Plaintiff to the pairing pool on the same basis as her peers.

52. Management also evaluated Plaintiff using performance measures that did not accurately reflect work within her control. Plaintiff had been instructed that qualifying stories would be measured when they reached "Ready for Review," after which further progression depended on review or approval by others. Bolen later relied on later stages of completion that Plaintiff could not unilaterally control. He also presented charts purporting to show deficient output that Plaintiff contemporaneously challenged as omitting completed work and measuring periods in which qualifying work was unavailable. Plaintiff requested the supporting and comparable information Bolen represented was available, but he did not provide responsive written substantiation.

53. On August 23, 2024, while discussing performance concerns, Bolen wrote: "Unfortunately, we haven't been able to connect in a while due to your Leave events." The statement expressly connected Plaintiff's protected leave with the ongoing performance-management process.

54. On October 9, 2024, Defendants reissued or continued the Performance Improvement Plan against Plaintiff, continued heightened scrutiny, excluded Plaintiff from opportunities, and placed Andrukaitis in a review role over her work contrary to ordinary policy or practice and without Plaintiff's agreement.

55. Defendants discouraged Plaintiff from using protected leave and escalated performance management after she exercised FMLA rights and complained about interference. Management contacted Plaintiff on her personal phone and email during protected leave, pressured her concerning work and leave administration, and treated protected absences or their effects as negative performance circumstances.

56. The close timing, escalation after complaints, departure from ordinary practices, comparator treatment, and repeated use of disadvantages Defendants themselves created support an inference of discriminatory and retaliatory motive.

**D. Disability accommodations and medical leave**

57. In June 2024, Plaintiff requested multiple reasonable accommodations addressing disability-related limitations that affected her ability to perform and function effectively at work. She timely participated in Liberty's process and provided supporting medical information through the channels Liberty designated.

58. On June 5, 2024, Moynihan acknowledged Plaintiff's accommodation request and scheduled a June 10 discussion. On August 6, 2024, Joseph Piccolo confirmed to Plaintiff that Moynihan had the accommodation case. These communications identify Moynihan as the Liberty representative assigned to handle the request.

59. After Plaintiff's repeated follow-up, Kristen Taylor transmitted a partial accommodation determination on August 28, 2024, copying Moynihan and Bolen. Liberty granted or modified certain requested measures but did not address the disposition of the complete set of accommodations supported by Plaintiff and her providers.

60. Plaintiff immediately sought clarification and requested identification of the accommodations granted, modified, or denied and the disposition of the outstanding requests. Liberty did not provide a complete written final determination resolving the entire request. The limited response and unanswered follow-up are the basis for Plaintiff's allegation that the process was incomplete, rather than a conclusion drawn from delay alone.

61. Managers and HR also failed to consistently implement accommodations that Liberty had approved. Plaintiff repeatedly notified Liberty that these failures were impairing her ability to function and perform effectively. Moynihan later acknowledged in her June 10, 2026 email that Plaintiff had been communicating with Talent Services in writing since

August 2024, confirming both Liberty's notice of the need and the continuing course of written accommodation communications.

62. During July and August 2024, Moynihan contacted Plaintiff's treating provider to request medical documentation. Plaintiff had asked that accommodation communications be written and that she remain copied, but Moynihan did not copy Plaintiff on the provider contacts. This prevented Plaintiff from contemporaneously tracking what was requested and responding to any misunderstanding, which made the approved communication accommodation less effective.

63. In or around October 2024, Plaintiff submitted an additional medically supported workplace-equipment accommodation request. Moynihan was assigned to Plaintiff's accommodation matter, but did not provide the requested accommodation, identify an effective alternative, or issue a written grant or denial before Plaintiff went on leave. The absence of any identified response is the factual basis for Plaintiff's allegation that this request was ignored.

64. Plaintiff last actively worked on December 3, 2024. She then began approved medical and disability leave, including FMLA leave. She requested extensions and additional leave and supplied medical information through the channels Liberty designated.

65. The finite leave Plaintiff sought fell within Liberty's own maximum-leave framework, which Moynihan later described as allowing up to 104 weeks from December 3, 2024 before failure to return might result in termination. Plaintiff therefore alleges that continued leave during that period was a facially available accommodation that required individualized consideration.

66. Liberty treated disability-benefit administration by Lincoln Financial Group as a substitute for an employment accommodation assessment and repeatedly directed Plaintiff to obtain a Lincoln release before Liberty would identify or discuss a job. Lincoln is not Plaintiff's employer and is not named as a defendant. Because Liberty controlled its positions, job descriptions, and essential functions, referral to Lincoln did not supply the employment information needed for an individualized accommodation or reassignment assessment.

**E. Equipment return, role availability, and redeployment**

67. On June 3, 2025, Gomes sent Plaintiff Liberty's six-month leave letter. The letter did not say that Plaintiff's position had already been eliminated; it warned that, after twenty-six weeks of leave, Liberty "may fill" the Associate Software Engineer position. It also said Plaintiff's manager would provide prepaid shipping materials for the return of company equipment.

68. In July 2025, Plaintiff advised Moynihan that disability-related limitations prevented her from using the equipment-return method Liberty had directed and requested a reasonable modification to permit return of the boxed company equipment. Plaintiff supplied the information Liberty requested to implement the modification.

69. Moynihan initially stated that she was looking into alternative return options. Despite Plaintiff's repeated follow-up and confirmation that the equipment remained ready for collection, Liberty ultimately redirected Plaintiff to the same method she had explained was inaccessible and did not provide the requested modification or an effective alternative.

70. Plaintiff asked whether her position had been or would be eliminated as part of a reduction in force or restructuring, who would make the decision, what criteria would be used, what would happen to her duties, and what reinstatement, reassignment, or other accommodation options existed. Liberty did not provide those details before declaring the role unavailable.

71. On October 29, 2025, Moynihan stated for the first documented time that Plaintiff's previous role "is no longer available." Moynihan told Plaintiff that she would have forty-five days to apply for open positions and that, if she did not secure a position by December 13, 2025, her employment would "ordinarily be terminated." This statement, not Gomes's June letter, is the basis for alleging that Liberty declared the position unavailable.

72. At that time, Plaintiff remained on approved disability-related leave and had not been medically cleared to return to work, conduct a competitive internal job search, or interview. Liberty's policy barred her from logging into company systems while on leave, she lacked access to the internal job portal, and Liberty had required return of the laptop that could access those systems. Those conditions prevented her from participating in the stated process on the same basis as an active employee.

73. On October 30, 2025 and thereafter, Plaintiff objected that the stated forty-five-day redeployment and termination process could not fairly or practically proceed while she remained on approved disability-related leave. She requested that Liberty pause the deadline, continue the accommodation process, address the disability-related modifications necessary for her to participate in equipment return, return to work, reassignment, and any internal application process, explain the status of her prior position, and provide the employer-controlled information and assistance necessary to preserve her employment.

74. On October 31, 2025, Moynihan said the forty-five-day process could pause while Plaintiff was not medically cleared and restated Liberty's policy: after more than twenty-six but fewer than 104 weeks of leave, an employee would be considered for

reinstatement if the prior position remained available and otherwise would receive forty-five days to obtain another position. Moynihan did not provide job-portal access, a vacancy list, job descriptions, or a recruiter liaison. The mismatch between the nominal forty-five-day opportunity and the information and access actually supplied is the basis for alleging that the process was inaccessible.

**F. Continuing post-charge accommodation and reassignment positions**

75. On May 19, 2026, Plaintiff filed her EEOC charge alleging, among other things, Liberty's ongoing failure to accommodate and engage in an interactive process concerning leave, return to work, and reassignment.

76. On June 10, 2026, Moynihan stated that Plaintiff's long-term-disability status satisfied Liberty's leave policy, that there was no separate leave-as-an-accommodation process, and that Liberty would address return to work or reassignment only after Plaintiff obtained a medical release through Lincoln. Moynihan asked for an estimated return-to-work date but did not identify a position or its essential functions.

77. In written requests dated July 9 and July 17, 2026, Plaintiff renewed her accommodation requests and asked Moynihan for an individualized assessment, the applicable leave and redeployment policies, the status of her employment and prior position, accessible return-to-work steps, and information about reassignment and vacancies.

78. On July 29, 2026, Moynihan stated that the forty-five-day process had been paused on November 13, 2025 until Plaintiff obtained a medical release; repeated that Plaintiff's previous position was no longer available; said Liberty would not determine what positions were available until Lincoln released Plaintiff; and said the forty-five-day period to apply and interview would begin after release. Moynihan also stated that Plaintiff would reach 104 weeks of leave on December 3, 2026.

79. Under the process Moynihan described, Plaintiff must obtain medical clearance before Liberty identifies an actual position or vacancy and provides the current essential functions, schedule, physical demands, and other job-specific requirements applicable to that position. A provider cannot assess whether Plaintiff can perform the essential functions of an unidentified job or what accommodation would be effective. That information gap is the factual reason Plaintiff alleges that the release-first condition obstructs, rather than advances, an individualized interactive process.

80. Liberty exclusively controls its internal vacancy information. Despite Plaintiff's repeated written requests, Moynihan did not provide access to internal job listings, identify a vacancy, disclose a search for a suitable position, appoint a recruiter liaison, or provide requisition information or job descriptions. At the same time, Moynihan maintained that Plaintiff could be placed on a short competitive clock and could face termination if she did not secure a position.

81. Liberty did not issue a complete written final determination addressing Plaintiff's outstanding accommodation requests from either the active-work period or the subsequent leave, equipment-return, redeployment, and return-to-work periods. Multiple requests remained unresolved, were only partially addressed, or were answered with instructions that did not provide the requested disability-related modification or an effective alternative. The August 28, 2024 partial determination, the unresolved additional medically supported request, and the 2025-2026 leave and redeployment emails show which matters remained unresolved.

82. As of filing, Moynihan has represented that Plaintiff remains employed, but her prior job is unavailable, she cannot use internal systems while on leave, Liberty will not identify openings before a Lincoln release, and she may face termination when the forty-five-day process begins or when Liberty's maximum-leave period ends. These stated conditions, rather than speculation about a completed termination, define Plaintiff's current employment status and alleged injury.

**G. Harm**

83. Defendants' conduct has caused Plaintiff lost compensation, including bonus and overtime compensation; lost or diminished advancement opportunities; loss of work and professional-development opportunities; damage to her employment record and professional reputation; lost benefits and job security; and impairment of future earning capacity.

84. Defendants' conduct caused and materially aggravated significant physical and psychological injury, substantially worsened Plaintiff's functioning, and contributed to her eventual inability to sustain her prior full-time work schedule. Plaintiff repeatedly reported while still working that the challenged workplace interactions were adversely affecting her physical and mental health. Her treating providers subsequently documented material work-related aggravation of her conditions and functional limitations. These injuries have persisted and require continuing treatment.

85. Liberty received repeated written notice of Plaintiff's complaints, FMLA approval, disabilities, requested accommodations, disability-related limitations, and inability to access internal openings. Its managers and Talent Services personnel nevertheless continued the challenged actions described above. That notice and continuation support Plaintiff's allegation of intentional, reckless, and/or consciously indifferent conduct to the extent required for the relief sought.

**COUNT I - TITLE VII DISCRIMINATION AND HOSTILE WORK ENVIRONMENT**

42 U.S.C. § 2000e-2

86. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

87. Plaintiff is Black and a woman and therefore belongs to protected classes under Title VII.

88. Liberty subjected Plaintiff to inferior terms and conditions of employment, including exclusion from the pairing pool from approximately October 2023 through December 3, 2024; denial of production work, mentorship, overtime access, and advancement support; denial of her 2023 bonus; and performance plans built in part on the lack of work and training that management controlled.

89. The circumstances support an inference that race, color, and/or sex contributed to that treatment: Plaintiff was the only Black employee engineer on the team; white and substantially younger engineers received visible mentorship and pairing; Liberty credited a white male colleague with mentoring Plaintiff even though he had not done so; and management continued Plaintiff's exclusion while supplying actual mentees and production opportunities to others. Those facts connect the protected characteristics to the unequal conditions rather than relying on Plaintiff's status alone.

90. The challenged conditions were continuing and work-altering rather than isolated: the pairing exclusion lasted approximately fourteen months until leave; managers repeatedly withheld work and answers, raised or repeated performance accusations, and used the resulting deficits in two PIPs and compensation decisions; and Bolen used hostile communications despite notice of Plaintiff's disability-related communication limits. In context with the comparator facts above, this course of conduct supports Plaintiff's hostile-work-environment claim.

91. Defendants are liable for the acts of managers and HR personnel who participated in, knew of, approved, or failed to correct the discrimination. Liberty had the means to correct Bolen's conduct and used those means at least once, when Talent Services directed him to release Plaintiff's withheld Shine Points recognition after Plaintiff complained. Despite repeated notice of Bolen's broader conduct from Plaintiff directly, from her complaints to Talent Consultation, and from her reports to Bolen's own supervisors, Liberty did not take comparable corrective action as to the remainder of that conduct.

## COUNT II - TITLE VII RETALIATION

42 U.S.C. § 2000e-3(a)

92. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

93. Plaintiff engaged in protected activity under Title VII by filing her May 19, 2026 EEOC charge, which expressly opposed race, color, and sex discrimination.

94. Defendants knew of Plaintiff's protected activity.

95. After receiving the charge, Liberty, through Moynihan's June 10 and July 29, 2026 emails, continued to withhold vacancy and job information, required a generalized Lincoln release before any job-specific discussion, and maintained the prospect of a forty-five-day competitive search followed by termination. Withholding information needed to preserve employment and conditioning any dialogue on an inaccessible process could deter a reasonable worker from pursuing a discrimination charge.

96. Moynihan communicated the June 10 position twenty-two days after the charge and repeated and formalized it on July 29 after Plaintiff renewed her objections. The temporal proximity, Liberty's knowledge, the absence of an individualized response to the charged practices, and the continuation of job-security consequences despite Plaintiff's renewed requests support an inference of retaliatory causation at the pleading stage.

**COUNT III - RACE DISCRIMINATION UNDER 42 U.S.C. § 1981**

42 U.S.C. § 1981

97. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

98. Plaintiff had and has the same right to make, perform, modify, and enforce her employment contract and to enjoy all benefits, privileges, terms, and conditions of that contractual relationship as white employees.

99. Liberty impaired Plaintiff's contractual employment rights by denying equal mentorship, production assignments, compensation, evaluations, and advancement support. Intentional race discrimination is plausibly inferred from the same-team comparison to white engineers, Plaintiff's status as the team's only Black employee engineer, the false attribution of mentorship to a white colleague, and management's continued use of the resulting deficits after Plaintiff objected.

100. The unique pairing exclusion, denial of mentorship and production access, false crediting of a white male colleague as Plaintiff's mentor, and use of management-created deficits against Plaintiff are among the circumstances supporting an inference of intentional race discrimination.

101. Absent the race-based differential treatment described above, Plaintiff would have received the work access, mentorship, and fair evaluation provided to white comparators; race was therefore a but-for cause of the contractual injuries alleged in this Count.

**COUNT IV - ADA DISCRIMINATION AND FAILURE TO ACCOMMODATE**

42 U.S.C. §§ 12112(a), 12112(b)(5)

102. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

103. Plaintiff is a qualified individual with a disability, has a record of disability, and/or was regarded as disabled within the meaning of the ADA.

104. Defendants knew of Plaintiff's disabilities and need for accommodation.

105. Reasonable accommodations were available that could have addressed Plaintiff's known disability-related limitations during active employment, leave, equipment return, return to work, and reassignment. Defendants' withholding of positions and essential functions further prevented a job-specific reassignment assessment.

106. Liberty delayed or failed to implement accommodations in concrete ways: its first partial determination did not issue until August 28, 2024; approved accommodations were not consistently implemented; additional medically supported requests remained unresolved; Liberty did not provide the requested disability-related modification to its equipment-return process; and Liberty later withheld job-specific information while requiring medical clearance. Those facts support both failure-to-accommodate and failure-to-engage allegations.

107. Disability was connected to the challenged terms because Liberty had medical documentation and repeated written notice of Plaintiff's limitations, yet failed to consistently implement approved accommodations, treated disability-related leave and its effects as performance circumstances, imposed an equipment-return method Plaintiff had explained was inaccessible because of disability-related limitations, and conditioned employment-preserving redeployment information on a Lincoln return-to-work release.

108. Lincoln could administer disability benefits and return-to-work medical-release paperwork, but only Liberty could identify its vacancies and essential job functions. By withholding those employer-controlled facts until after release, Liberty prevented the job-specific assessment that could identify an effective accommodation or reassignment; referral to Lincoln therefore did not complete Liberty's interactive-process obligations.

**COUNT V - ADA RETALIATION, COERCION, AND INTERFERENCE**

42 U.S.C. § 12203

109. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

110. Plaintiff engaged in protected activity by requesting accommodations, opposing disability discrimination, seeking an interactive process, and filing an EEOC charge.

111. Liberty knew of Plaintiff's protected activities. After her leave complaints and accommodation request, Liberty continued the pairing exclusion and heightened scrutiny, issued the October 9, 2024 PIP, failed to complete the accommodation determinations, imposed an inaccessible equipment-return process, and later conditioned redeployment information on a Lincoln release while warning of termination-related deadlines.

112. Defendants' conduct interfered with and tended to deter Plaintiff's exercise and enjoyment of rights protected by the ADA.

113. The October 9 PIP followed Plaintiff's June accommodation request and August partial determination; the unresolved accommodation issues persisted into leave; and Moynihan maintained the release-first and job-security conditions after the EEOC charge. That sequence, together with Liberty's notice and its use of management-created work deficits, supports an inference that protected activity contributed to the challenged interference and retaliation.

**COUNT VI - ADEA AGE DISCRIMINATION**

29 U.S.C. § 623(a)

114. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

115. Plaintiff was over forty and, to her knowledge, the oldest employee engineer on her team.

116. Substantially younger engineers on Plaintiff's team or sister team received visible mentorship, pairing, technical sponsorship, assignments, and advancement opportunities that Plaintiff repeatedly requested. Plaintiff, the oldest employee engineer on her team to her knowledge, remained excluded from pairing and was evaluated on deficits that the exclusion helped create.

117. The consistent age contrast, the repeated denial of the same development mechanisms supplied to substantially younger engineers, and management's continued use of the resulting deficits support Plaintiff's allegation that, but for her age, she would not have suffered the limiting actions challenged under this Count.

**COUNT VII - FMLA INTERFERENCE AND RETALIATION**

29 U.S.C. § 2615

118. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

119. For FMLA purposes, Plaintiff's worksite was the Liberty office to which she reported or from which her work was assigned. Upon information and belief, Defendants employed at least 50 employees within 75 miles of that worksite. Plaintiff began working for Defendants on January 18, 2022, and, as of December 3, 2024, when she last actively worked, had been employed by Defendants for approximately 35 months and had worked at least 1,250 hours in the preceding twelve months. Defendants were therefore covered employers, Plaintiff was an eligible employee, and Plaintiff was entitled to and took FMLA-protected leave during the relevant period.

120. Liberty burdened and discouraged FMLA use in specific ways: Martinez questioned why Plaintiff would use FMLA rather than vacation and told her to educate him; Bolen

expressly tied the performance discussion to Plaintiff's leave events; managers contacted Plaintiff during protected leave; and Liberty used leave-related absence or its effects in the performance process.

121. Plaintiff complained about interference with protected leave and exercised or attempted to exercise FMLA rights.

122. After Plaintiff sought and used intermittent FMLA leave and complained to HR, Liberty issued the May 29 and October 9, 2024 PIPs, continued heightened scrutiny and pairing exclusion, and restricted work opportunities. The timing and Bolen's written reference to leave in a performance discussion connect the leave activity to the adverse treatment and support retaliatory causation.

123. Defendants' violations were willful because Martinez knew Plaintiff intended to seek FMLA leave, Bolen received written notice of the approved intermittent leave, Plaintiff complained to HR about interference and retaliation, and Defendants nevertheless continued to connect leave events and their effects to performance management and discipline.

**COUNT VIII - NYSHRL DISCRIMINATION, HOSTILE WORK ENVIRONMENT, AND FAILURE TO ACCOMMODATE**

N.Y. Executive Law § 296(1), (3)

124. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

125. Defendants discriminated against Plaintiff because of race, color, sex, age, and disability in the terms, conditions, and privileges of employment.

126. The pairing exclusion, repeated denial of production work and mentorship, bonus denial, two PIPs, accommodation delays, and inaccessible redeployment conditions were more than petty slights or trivial inconveniences because they affected Plaintiff's daily work access, compensation, professional development, employment record, and job security.

127. Liberty knew of Plaintiff's disabilities through medical documentation and repeated requests. Medically supported workplace accommodations, an accessible equipment-return process, continued finite leave, and a job-specific reassignment process were facially available measures; Liberty either only partially implemented them or failed to identify an undue hardship or effective alternative.

128. The conduct alleged in this Count occurred within the applicable limitations period or is actionable as part of a continuing hostile environment; earlier conduct also supplies relevant background and evidence of motive.

**COUNT IX - NYSHRL RETALIATION**

N.Y. Executive Law § 296(7)

129. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

130. Plaintiff requested reasonable accommodations, opposed disability-accommodation failures, complained about conduct she reasonably believed violated disability and leave protections, and filed an EEOC charge expressly opposing race, color, sex, age, and disability discrimination.

131. Liberty knew of Plaintiff's protected activity through her written requests, HR complaint, and EEOC charge. The subsequent PIPs, continued accommodation nonresponses, withholding of job information, and maintenance of termination-related deadlines were reasonably likely to deter further protected activity.

132. The sequence of Plaintiff's complaints and requests followed by performance escalation, together with Bolen's express linkage of leave to performance and Moynihan's post-charge continuation of the challenged conditions, supports an inference that Plaintiff's protected activity contributed to Liberty's conduct and resulting harm.

**COUNT X - NYCHRL DISCRIMINATION, HOSTILE WORK ENVIRONMENT, AND FAILURE TO ACCOMMODATE**

N.Y.C. Administrative Code § 8-107(1), (15)

133. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

134. Liberty treated Plaintiff less well through the work, mentorship, compensation, performance, accommodation, and redeployment actions detailed above. Same-team and sister-team comparators received support Plaintiff did not receive, while disability-related requests remained unresolved; these circumstances support the allegation that race, color, gender, age, and disability played a role in the unequal treatment.

135. Defendants subjected Plaintiff to unequal terms and conditions, discriminatory harassment, and adverse actions as alleged above.

136. Liberty had actual notice of Plaintiff's disabilities and requested accommodations. The partial August 28 response, unresolved additional request, inaccessible equipment-return process, and release-first redeployment position show the specific ways Liberty failed to provide or fully consider accommodations without identifying undue hardship.

137. Defendants have not met their burden under the NYCHRL to show that no reasonable accommodation would have enabled Plaintiff to satisfy the essential requisites of an identified position.

**COUNT XI - NYCHRL RETALIATION**

N.Y.C. Administrative Code § 8-107(7)

138. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

139. Plaintiff requested disability accommodations in good faith, opposed disability-accommodation failures, and filed an EEOC charge expressly opposing race, color, gender, age, and disability discrimination.

140. Liberty knew of those activities and thereafter continued performance measures, accommodation nonresponses, inaccessible redeployment conditions, and job-security warnings. Because those actions affected compensation, daily work, and continued employment, they were reasonably likely to deter protected activity.

141. The timing, Bolen's written connection between leave and performance, and the continuation of challenged conditions after Plaintiff's written objections and EEOC charge support an inference that protected activity played a role in Liberty's conduct.

## COUNT XII - FAILURE TO ENGAGE IN A COOPERATIVE DIALOGUE

N.Y.C. Administrative Code § 8-107(28)

142. Plaintiff repeats and realleges each preceding paragraph as if fully set forth herein.

143. Plaintiff repeatedly requested accommodations, and Defendants knew or should have known that she might require accommodations.

144. Liberty did not complete a timely good-faith dialogue: the June 2024 request produced only an August 28 partial response; Plaintiff's request for reasons went unanswered; Moynihan did not decide an additional medically supported request; and in 2025-2026 Moynihan refused to identify a job or vacancy before a Lincoln release, even though Liberty alone possessed the relevant job information.

145. Defendants obstructed or delayed dialogue, treated benefits administration as a substitute for the employment accommodation process, withheld the job and vacancy information necessary for an individualized assessment, and failed to conclude the dialogue with a complete written final determination identifying the accommodations granted or denied.

146. Defendants' failure to engage in a cooperative dialogue is an independent violation of the NYCHRL.

## PRAYER FOR RELIEF

147. Wherefore, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendants and award:

A. A declaration that Defendants violated the federal, New York State, and New York City laws identified above;

B. Appropriate injunctive relief, including a lawful individualized accommodation and cooperative-dialogue process; access to relevant vacancies and job information; removal or correction of retaliatory and discriminatory performance records; and reinstatement or placement in a suitable position if feasible;

C. Back pay, lost bonus and overtime compensation, lost benefits, pension-related losses, and other economic damages, with prejudgment interest;

D. Front pay and future-benefit losses in lieu of reinstatement if reinstatement or placement is not feasible;

E. Compensatory damages for emotional distress, reputational injury, and other non-economic harm;

F. Punitive damages under the laws that authorize them;

G. Liquidated damages under the ADEA and FMLA for willful violations;

H. Reasonable attorneys' fees if incurred, costs, and other recoverable litigation expenses; and

I. Such other and further legal and equitable relief as the Court deems just and proper.

**JURY DEMAND**

148. Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: August 17, 2026
Brooklyn, New York

Respectfully submitted,

TIME DARDEN, Plaintiff Pro Se
ACP #8413, P.O. Box 1110
Albany, New York 12201
Telephone: (607) 229-3021
Email: TimeDarden@proton.me

# EXHIBIT A

**EEOC Dismissal and Notice of Right to Sue**
**Charge No. 520-2026-01763**
**Issued and received May 22, 2026**

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

### DISMISSAL

(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 05/22/2026

**To:** Ms. Time Darden
ACP #8413 PO Box 1110
ALBANY, NY 12201
Charge No: 520-2026-01763

EEOC Representative and email: ARACELY FRANCOIS
INVESTIGATOR
ARACELY.FRANCOIS@EEOC.GOV

---

### DISMISSAL

The EEOC is closing this charge because: non-jurisdictional.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 520-2026-01763.

On behalf of the Commission,

Digitally Signed By:Arlean Nieto
05/22/2026

Arlean Nieto
Acting District Director

**Cc:**
LIBERTY MUTUAL

*[address redacted]*

Robert Johnson
175 BERKELEY ST
BOSTON, MA 02116

Please retain this Notice for your records.

## INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal.** You should **keep a record of the date you received EEOC's official notice of dismissal.** Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to: https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method). You may also submit a

FOIA request for your charge file by U.S. Mail by submitting a signed, written request identifying your request as a "FOIA Request" for Charge Number 520-2026-01763 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

**To make a Section 83 request for your charge file**, submit a signed written request stating it is a "Section 83 Request" for Charge Number 520-2026-01763 to the District Director at Arlean Nieto, 33 Whitehall St 5th Floor, New York, NY 10004.

You may request the charge file up to 90 days after receiving EEOC's official notice of dismissal. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA requests, go to https://www.eeoc.gov/eeoc/foia/index.cfm.

For more information on submitted Section 83 requests, go to https://www.eeoc.gov/foia/section-83-disclosure-information-charge-files.

**NOTICE OF RIGHTS UNDER THE ADA AMENDMENTS ACT OF 2008 (ADAAA)**

The ADA was amended, effective January 1, 2009, to broaden the definitions of disability to make it easier for individuals to be covered under the ADA/ADAAA. A disability is still defined as (1) a physical or mental impairment that substantially limits one or more major life activities (actual disability); (2) a record of a substantially limiting impairment; or (3) being regarded as having a disability. *However, these terms are redefined, and it is easier to be covered under the new law.*

If you plan to retain an attorney to assist you with your ADA claim, we recommend that you share this information with your attorney and suggest that he or she consult the amended regulations and appendix, and other ADA related publications, available at: http://www.eeoc.gov/laws/types/disability_regulations.cfm.

**"Actual" disability or a "record of" a disability**

If you are pursuing a failure to accommodate claim you must meet the standards for either "actual" or "record of" a disability:

- **The limitations from the impairment no longer must be severe or significant** for the impairment to be considered substantially limiting.
- In addition to activities such as performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking, concentrating, reading, bending, and communicating (more examples at 29 C.F.R. § 1630.2(i)), **"major life activities" now include the operation of major bodily functions**, such as: functions of the immune system, special sense organs and skin; normal cell growth; and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive functions; or the operation of an individual organ within a body system.
- **Only one** major life activity need be substantially limited.
- Except for ordinary eyeglasses or contact lenses, the beneficial effects of **"mitigating measures"** (e.g., hearing aid, prosthesis, medication, therapy, behavioral modifications)

**are not considered** in determining if the impairment substantially limits a major life activity.

- An impairment that is **"episodic"** (e.g., epilepsy, depression, multiple sclerosis) or **"in remission"** (e.g., cancer) is a disability if it **would be substantially limiting when active**.
- An impairment **may be substantially limiting even though** it lasts or is expected to last **fewer than six months**.

**"Regarded as" coverage**

An individual can meet the definition of disability if an **employment action was taken because of an actual or perceived impairment** (e.g., refusal to hire, demotion, placement on involuntary leave, termination, exclusion for failure to meet a qualification standard, harassment, or denial of any other term, condition, or privilege of employment).

- "Regarded as" coverage under the ADAAA no longer requires that an impairment be substantially limiting, or that the employer perceives the impairment to be substantially limiting.
- The employer has a defense against a "regarded as" claim only when the impairment at issue is objectively **both** transitory (lasting or expected to last six months or less) **and** minor.
- A person is not able to bring a failure to accommodate claim **if** the individual is covered only under the "regarded as" definition of "disability."

***Note:*** *Although the amended ADA states that the definition of disability "shall be construed broadly" and "should not demand extensive analysis," some courts require specificity in the complaint explaining how an impairment substantially limits a major life activity or what facts indicate the challenged employment action was because of the impairment. Beyond the initial pleading stage, some courts will require specific evidence to establish disability.* For more information, consult the amended regulations and appendix, as well as explanatory publications, available at http://www.eeoc.gov/laws/types/disability_regulations.cfm.

Revised 7.16.2026; Effective 7.16.2026

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Time Darden

**(b)** County of Residence of First Listed Plaintiff: Kings County, NY
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Time Darden, Plaintiff Pro Se
ACP #8413, P.O. Box 1110, Albany, NY 12201
(607) 229-3021 | TimeDarden@proton.me

## DEFENDANTS

Liberty Mutual Technology Group Inc.
Liberty Mutual Group Inc.

County of Residence of First Listed Defendant: Suffolk County, MA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☒ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee *
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
42 U.S.C. §§ 2000e et seq., 12101 et seq., 1981; 29 U.S.C. §§ 623, 2615

Brief description of cause:
Employment discrimination, retaliation, failure to accommodate, FMLA interference, and related state and city claims.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ Over $150,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE NCM / LKE DOCKET NUMBER 26-cv-00340

FOR OFFICE USE ONLY

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

* Please respond to Part F on Page 2

**PART A - CERTIFICATION OF ARBITRATION ELIGIBILITY**

Local Arbitration Rule 83.7 provides that with certain exceptions, actions seeking money damages only in an amount not in excess of $150,000, exclusive of interest and costs, are eligible for compulsory arbitration. The amount of damages is presumed to be below the threshold amount unless a certification to the contrary is filed.

Case is Eligible for Arbitration No

I, Time Darden, Plaintiff Pro Se, counsel for Self, do hereby certify that the above captioned civil action is ineligible for compulsory arbitration for the following reason(s):

X monetary damages sought are in excess of $150,000.00 exclusive of interest and costs,

X the complaint seeks injunctive relief, or

the matter is otherwise ineligible for the following reason:

**PART B - DISCLOSURE STATEMENT - FEDERAL RULES of CIVIL PROCEDURE 7.1**

Identify any parent corporation and any publicly held corporation that owns 10% or more or its stocks. Add an additional page if needed.

Plaintiff is a natural person; no Rule 7.1 corporate disclosure is required for Plaintiff.

**PART C - RELATED CASE STATEMENT (Section VIII on the Front of this Form)**

Please list all cases that are arguably related pursuant to Division of Business Rule 3 in Section VIII on the front of this form. Rule 3(a) provides that "A civil case is "related" to another civil case for purposes of this guideline when, because of the similarity of facts and legal issues or because the cases arise from the same transactions or events, a substantial saving of judicial resources is likely to result from assigning both cases to the same judge and magistrate judge." Rule 3(a) provides that "A civil case shall not be deemed "related" to another civil case merely because the civil case involves identical legal issues, or the same parties." Rule 3 further provides that "Presumptively, and subject to the power of a judge to determine otherwise pursuant to paragraph (b), civil cases shall not be deemed to be "related" unless both cases are still pending before the court."

Darden v. Liberty Mutual Health and Welfare Plan et al., No. 26-cv-00340-NCM-LKE (pending).
The actions share Plaintiff and overlapping leave communications and entities, but assert different claims.

**PART D - NEW YORK EASTERN DISTRICT DIVISION OF BUSINESS RULE 1(d)(3)**

*If you answer "Yes" to any of the questions below, this case will be designated as a Central Islip case and you* ***must select Office Code 2.***

1. Is the action being removed from a state court that is located in Nassau or Suffolk County? No
2. In actions not involving real property, is the action being brought against United States, its officers or its employees AND the majority of the plaintiffs reside in Nassau or Suffolk County? No
3. If you answered "No" to all parts of Questions 1 and 2:
   a. Did a substantial part of the events or omissions giving rise to claim or claims occur in Nassau or Suffolk County? No
   b. Do the majority of defendants reside in Nassau or Suffolk County? No
   c. Is a substantial amount of any property at issue located in Nassau or Suffolk County? No
4. If this is a Fair Debt Collection PracticeAct case, was the offending communication received in either Nassau or Suffolk County? No
   (*Note, a natural person is considered to reside in the county in which that person is domiciled; an entity is considered a resident of the county that is either its principal place of business or headquarters, of if there is no such county in the Eastern District, the county within the District with which it has the most significant contacts*).

**PART E - BAR ADMISSION**

1. I am currently admitted in the Eastern District of New York and currently a member in good standing of the bar of this court. No

If you answered No to E(1), please see instructions and Local Civ. R. 1.3.

2. Are you currently the subject of any disciplinary action (s) in this or any other state or federal court? No If yes, please explain:

PART F - IMMIGRATION HABEAS

1. Is this petition based on an immigration detention? No

2. Does this case require immediate attention of a judge? No

If you answered Yes in Part F, and are filing this action after business hours, please see instructions here: https://www.nyed.uscourts.gov/emergency-applications-filed-after-business-hours.

I certify the accuracy of all information provided above.

Signature: ______________________

Date: August 17, 2026

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ AUG 19 2026 ★
BROOKLYN OFFICE

Time Darden

ACP #8413, P.O. Box 1110

Albany, New York 12201

Telephone: (607) 229-3021

Email: TimeDarden@proton.me

August 17, 2026

Clerk of Court

United States District Court

Eastern District of New York

225 Cadman Plaza East

Brooklyn, New York 11201

**Re: New Civil Action — Time Darden v. Liberty Mutual Technology Group Inc. and Liberty Mutual Group Inc.**

Dear Clerk of Court:

I am filing the enclosed civil action pro se. Enclosed for filing please find the following documents:

- One (1) original Complaint and Jury Demand, with Exhibit A (EEOC Dismissal and Notice of Right to Sue), signed;
- Two (2) copies of the Complaint and Jury Demand, with Exhibit A;
- One (1) Civil Cover Sheet, signed and dated;
- Two (2) proposed Summonses in a Civil Action (Form AO 440), one for each named Defendant; and
- Payment of the $405.00 filing fee by check payable to Clerk of the Court, USDC, EDNY.

I respectfully request that the Clerk file the Complaint, assign a civil action number, and issue the enclosed Summonses so that I may proceed with service on Defendants.

This action was filed within the ninety-day period following my receipt of the EEOC's Notice of Right to Sue, a copy of which is attached to the Complaint as Exhibit A.

I am a participant in the New York State Address Confidentiality Program (ACP #8413); please direct all correspondence to the address above.

Please contact me at the telephone number or email address above with any questions regarding this filing.

Respectfully submitted,

Time Darden, Plaintiff Pro Se

Enclosures as listed above

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

## Eastern District of New York

**TIME DARDEN,**

*Plaintiff,*

v.

**LIBERTY MUTUAL TECHNOLOGY GROUP INC.**
**and**
**LIBERTY MUTUAL GROUP INC.,**

*Defendants.*

Civil Action No. ______________

## SUMMONS IN A CIVIL ACTION

**To: (Defendant's name and address)**

**Liberty Mutual Technology Group Inc.**

c/o Corporation Service Company
84 State Street
Boston, Massachusetts 02109

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12(a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Time Darden
ACP #8413, P.O. Box 1110
Albany, New York 12201
Telephone: (607) 229-3021
Email: TimeDarden@proton.me

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**CLERK OF COURT**

Date: ________________ ____________________________________________

Signature of Clerk or Deputy Clerk

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. ______________

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for (name of individual and title, if any) ________________________________

was received by me on (date) ___________________.

☐ I personally served the summons on the individual at (place) ___________________________

on (date) ___________________; or

☐ I left the summons at the individual's residence or usual place of abode with (name) __________

____________________, a person of suitable age and discretion who resides there,

on (date) ___________________, and mailed a copy to the individual's last known address; or

☐ I served the summons on (name of individual) ___________________________, who is

designated by law to accept service of process on behalf of (name of organization)

Liberty Mutual Technology Group Inc.

on (date) ___________________; or

☐ I returned the summons unexecuted because ___________________________________________; or

☐ Other (specify): ______________________________________________________________.

My fees are $ __________ for travel and $ __________ for services, for a total of $ __________.

I declare under penalty of perjury that this information is true.

Date: _______________ _________________________________________

Server's signature

_________________________________________

Printed name and title

_________________________________________

_________________________________________

Server's address

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12) Summons in a Civil Action

## UNITED STATES DISTRICT COURT

for the

**Eastern District of New York**

| | |
|---|---|
| **TIME DARDEN,**<br><br>*Plaintiff,*<br><br>v.<br><br>**LIBERTY MUTUAL TECHNOLOGY GROUP INC. and LIBERTY MUTUAL GROUP INC.,**<br><br>*Defendants.* | Civil Action No. ______________ |

## SUMMONS IN A CIVIL ACTION

**To: (Defendant's name and address)**

**Liberty Mutual Group Inc.**

c/o Corporation Service Company
84 State Street
Boston, Massachusetts 02109

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12(a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Time Darden
ACP #8413, P.O. Box 1110
Albany, New York 12201
Telephone: (607) 229-3021
Email: TimeDarden@proton.me

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**CLERK OF COURT**

Date: ______________ ________________________________________

Signature of Clerk or Deputy Clerk

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No. ______________

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for (name of individual and title, if any) ____________________________

was received by me on (date) ________________.

☐ I personally served the summons on the individual at (place) ______________________

on (date) ________________; or

☐ I left the summons at the individual's residence or usual place of abode with (name) __________

________________, a person of suitable age and discretion who resides there,

on (date) ________________, and mailed a copy to the individual's last known address; or

☐ I served the summons on (name of individual) ______________________, who is

designated by law to accept service of process on behalf of (name of organization)

Liberty Mutual Group Inc.

on (date) ________________; or

☐ I returned the summons unexecuted because ________________________________; or

☐ Other (specify): ____________________________________________.

My fees are $ __________ for travel and $ __________ for services, for a total of $ __________.

I declare under penalty of perjury that this information is true.

Date: ______________ ________________________________

Server's signature

________________________________

Printed name and title

________________________________

________________________________

Server's address

Additional information regarding attempted service, etc:

ORIGIN ID:BJJA (607) 229-3021
T DARDEN

2220 CALDWELL ST

SANDUSKY, OH 44870
UNITED STATES US

SHIP DATE: 17AUG26
ACTWGT: 0.20 LB
CAD: 266596321/INET4535
DIMS: 11x9x1 IN

BILL SENDER

TO **CLERK'S OFFICE**
**UNITED STATES DISTRICT COURT, EDNY**
**225 CADMAN PLAZA EAST**
**225 CADMAN PLAZA EAST**
**BROOKLYN NY 11201**
(718) 613-2600 REF:
INV:
PO: DEPT:

346-4542
PRIORITY OVERNIGHT
225 CADMAN PLZ E
BROOKLYN NY 11201

TUE - 18 AUG 10:30A
PRIORITY OVERNIGHT

TRK# 0201 8758 8634 4884

**NS EGXA**

11201
NY-US EWR

US DISTRICT COURT E.D.N.Y.
★ AUG 19 2026 ★
BROOKLYN OFFICE